IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

EARL BALIS II,

       **Plaintiff,**

v.                                 **CASE NO. 2:10-cv-01304**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, Earl Balis II (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on February 19, 2008, alleging disability as of February 1, 2008, due to stroke, left hemiparesis, hypertension, aortic aneurysm, depression, and vision problems.  (Tr. at 13, 128-30, 131-33, 156-63, 196-202, 207-13.)  The claims were denied initially and upon reconsideration.  (Tr. at 13, 73-78, 84-86, 87-89.)  On January 16, 2009, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 90-91.)  The hearing was held on August 19, 2009, before the Honorable James P. Toschi.  (Tr. at 30-68,

99-103.)  By decision dated September 24, 2009, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 13-29.)  The ALJ's decision became the final decision of the Commissioner on September 27, 2010, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-5.)  On November 16, 2010, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment.  Id. §§ 404.1520(c), 416.920(c).  If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4.  Id. §§ 404.1520(d), 416.920(d).  If it does, the claimant is found disabled and awarded benefits.  Id.  If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work.  Id. §§ 404.1520(e), 416.920(e).  By satisfying inquiry four, the claimant establishes a prima facie case of disability.  Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).  The burden then shifts

to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. §§ 404.1520(f), 416.920(f) (2002).   The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date.  (Tr. at 15.)   Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of hypertension, thoracic aortic aneurysm, obesity, cerebrovascular accident, chronic pain of the left knee, left hip and left shoulder, and depression.  (Tr. at 15-19.)  At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1.  (Tr. at 19-21.)  The ALJ then found that Claimant has a residual functional capacity for light work, reduced by nonexertional limitations.  (Tr. at 21-27.)  As a result, Claimant cannot return to his past relevant work. (Tr. at 27.)  Nevertheless, the ALJ concluded that Claimant could perform jobs such as mail clerk, machine operator, and sales attendant which exist in significant numbers in the national economy.  (Tr. at 27-28.)  On this basis, benefits were denied.  (Tr. at 28.)

<u>Scope of Review</u>

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>,

substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.  Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).  Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was 45 years old at the time of the administrative hearing.  (Tr. at 27.)  He withdrew from high school in the twelfth grade and obtained a GED.  (Tr. at 27, 215-17, 435.)  In the past, he worked as a construction laborer and a cashier.  (Tr. at 61.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it further below.

Physical Evidence

On November 2, 2007, Claimant was transported to Jackson General Hospital by ambulance due to chest pain.  (Tr. at 218-45.)  He was diagnosed with "Abnormal EKG,

4

chest pain" and transported by ambulance to Charleston Area Medical Center ["CAMC"] Memorial for "specialized cardiac care." (Tr. at 234, 242, 243.)

On November 2, 2007, Claimant arrived at CAMC Memorial Emergency Department for further evaluation and treatment wherein Mitchell N.  Rashid, M.D. stated that a Myocardial Perfusion Study showed "chest pain consistent with acute coronary syndrome...with ejection fraction of 39%, dilated left ventricle, and a mild to moderate inferolateral reversible defect." (Tr. at 255.)  Claimant stated that his chest pain and shortness of breath began the previous day during an argument at work. (Tr.  at 250.) An echocardiogram showed an ejection fraction between 50% and 55% with moderate concentric left ventricular hypertrophy and mild dilation of the left atrium. (Tr.  at 260.)

On November 6, 2007, Dr.  Rashid ordered a CT scan of Claimant's chest wherein he was found to have "1.  Mild aneurysmal dilation of the ascending thoracic... 2.  Mild ectasia of the descending thoracic aorta... 3.  Otherwise no signs of infiltrates, pneumothorax or pleural effusions." (Tr.  at 265.)

On December 3, 2007, Claimant had a follow-up visit with Dr.  Rashid at the West Virginia Heart and Vascular Institute. (Tr.  at 348-55.) Dr.  Rashid stated that Claimant denied any current symptoms and found that "[o]verall the patient has been doing well...normal gait, able to stand without difficulty, patient able to undergo exercise testing...mood normal, affect appropriate.  Assessment: Peripheral Vascular Disease, Unspecified 443.9, Tobacco Use, Personal History of V15.82....CT chest to monitor thoracic aortic aneurysm in 6 months." (Tr.  at 345-55.)

On January 31, 2008, Claimant underwent testing at CAMC Department of Medical Imagining through admittance at General Emergency Department. (Tr.  at 285-90.)

5

Johnsey L.  Leef III, M.D. stated that a "CT head without contrast" showed:

> The ventricles and sulci are unremarkable.  There is no mass effect or midline
> shift.  There is no evidence of intracranial hemorrhage.  There is
> dolichoectasia of the basilar artery.  There is mild hypodensity with focal area
> of rounded hypodensity in the left periventricular while matter of the
> posterior left frontal lobe.  No other abnormalities are identified.
>
> IMPRESSION:
> 1.  Evolving age indeterminate intarct/ischemia left periventricular while
> matter posterior frontal lobe.
> 2.  Dolichoectasia of the basilar artery.

 (Tr.  at 285.)

Dr.  Leef stated that the findings of a frontal portable chest image were: "Cardiac and

hilar mediastinal silhouettes are unremarkable.  The lungs are clear.  IMPRESSION:  No

radiographic evidence of acute disease."  (Tr.  at 287.)

Dr.  Leef stated that the findings of a CT angiogram of the chest with and without

contrast were:

> There is no evidence of thoracic aortic dissection.  There is mild aneurysmal
> dilation of the thoracic aorta unchanged from prior examination measuring
> approximately 4-4.1 sonometers transversely.  There is some tortuosity of the
> ascending thoracic aorta.  Noncontrasted portion of the examination
> demonstrates atherosclerotic disease of the thoracic aorta which is mild and
> atherosclerotic disease of the coronary arteries.  Evaluation of the lung
> windows demonstrates the lungs to be clear with the exception of a few small
> calcified granulomas of the lung bases...
> IMPRESSION:
> 1.  Mild dilation of the ascending thoracic aorta.  No intraval change.  No
> evidence of dissection.
> 2.  Atherosclerotic disease of the thoracic aorta and coronary arteries.

(Tr.  at 289-90.)

On February 1, 2008, Claimant was admitted to CAMC with "speech problems and

left-sided weakness" wherein he was diagnosed with "acute cerebrovascular accident with

left hemiparesis."  (Tr.  at 267, 457.)  Kuruvilla John , M.D. reported: "He has a new middle

cerebral artery infarction on the left side.  He has an approximately 1–15% risk of dying from the stroke." (Tr. at 279.)

On February 1, 2008, CAMC reported that Claimant had an x-ray of his right foot after he fell in the emergency room and complained of pain. (Tr. at 291.) Jennifer M. Smith, M.D. found "There is an inferior calcaneal spur.  There is no convincing acute fracture or dislocation." Id.

In an undated report, J. A. Heit, M.D., Mayo Clinic Medical Laboratories, reported that a specimen collected from Claimant on February 1, 2008 showed that Claimant "DOES NOT have the factor V Leiden (R5060) mutation…[and] DOES NOT have the Prothrombin G20210A mutation." (Tr. at 314-15.)

On February 2, 2008, John Alan Willis, M.D., CAMC Department of Medical Imaging, reported that Claimant had a MR angiogram of his neck with contrast which showed "[n]o evidence of hemodynamically significantly stenosis in either carotid bifurcation." (Tr. at 337-38.)

On February 3, 2008, Kenneth C. Wright, M.D. stated: "I would like speech pathology to do a swallowing evaluation for him and agree with plans for physical and occupational therapy.  He will definitely need a comprehensive inpatient medical rehabilitation program.  We will continue to monitor and plan eventual transfer to CAMC Medical Rehabilitation Center." (Tr. at 281-82.)

On February 4, 2008, a form titled West Virginia Department of Health and Human Resources Physician's Summary states: "Diagnosis: CVA [cerebrovascular or cardiovascular accident (stroke)] w/ [with] L [left] hemiparesis.  Prognosis: Limited…Employment Limitation: Cannot ambulate or use his L [left] arm or L [left] leg." (Tr. at 248.) "Yes" has

7

been marked to the question: "Is this individual's incapacity or disability such that it is necessary for someone to stay in the home with him on a substantially continuous basis?" Id.  "No" has been marked to the question: "Is this individual able to care for children under age six?"  Id.  The doctor's signature is illegible.  Id.

On February 6, 2008, Claimant underwent a transesophageal echo by Scott Duffy, M.D. wherein Dr. Duffy concluded:

> FINDINGS: There is evidence of moderate concentric left ventricular hypertrophy with no outflow tract obstruction. The LV function is normal. The estimated ejection fraction is 55%. The right ventricle is normal in size and function. The atria is normal size bilaterally. The left atrial appendage is well visualized and there is no evidence of thrombus. A bubble study was done to exclude PFO or shunt.
>
> VALVES: The aortic valve is trileaflet with no stenosis or regurgitation. The mitral valve is structurally normal with no stenosis and mild regurgitation. The tricuspid valve is structurally normal with no stenosis and trace regurgitation. The pulmonary valve is structurally normal with no stenosis or regurgitation.
>
> MISCELLANEOUS: No evidence of intracardiac vegetation or thrombus.
>
> IMPRESSIONS:
> 1. Moderate LVH with normal LV function.
> 2. No evidence of intracardiac vegetation, thrombus or shunt.

(Tr.  at 292, 462.)

On February 7, 2008, Claimant was discharged from CAMC.  The discharge summary stated that Claimant would be discharged to a skilled nursing facility when a bed is available.  (Tr. at 267-68.)

On April 7, 2008, Claimant had a follow-up visit with Dr. Rashid. Dr. Rashid stated that Claimant "has no current symptoms.  The patient denies chest pain, dyspnea, palpitations, and bilateral lower extremity edema...Overall the patient has been doing well."

(Tr. at 358.)  He stated that Claimant denied anxiety, had a normal mood, and appropriate affect.  (Tr. at 359-60.)   Regarding Claimant's gait and station, he found "residual weakness on left upper and lower extremity."  (Tr. at 360.)  He further stated that lab studies showed Claimant had hyperlipidemia.  (Tr. at 357.)

Claimant was treated by Shark Bird, M.D., Ravenswood Family Medicine Center on June 10, 2008, July 1, 2008, July 11, 2008, July 31, 2008, and September 2, 2008.  (Tr. at 400-08.)  At the initial visit wherein Claimant was established as a new patient, Dr. Bird noted: "Plan: daily exercise, low sodium, low cholesterol diet. Strongly advised on smoking cessation...advised to bring all meds to next appointment."  (Tr. at 405.)  At the July 31, 2008 office visit, Dr. Bird noted: "pt [patient] here for pain meds...Weight loss was advised and methods of weight loss were discussed.  I emphasized the importance of a permanent, life-long plan for dietary change...PT WALKED OUT WITHOUT STOPPING AT MY DESK TO GET ORDERS FOR X-RAYS."  (Tr. at 402-03.)  At the final office visit on September 2, 2008, Dr. Bird stated "Pt here for lt [left] arm and shoulder and lt knee and hip pain and headaches, denies any other problems, bp [blood pressure]...Plan: flu shot rt deltoid get x-ray of left shoulder and left knee and continue all meds same."  (Tr. 402.)

On July 7, 2008, Claimant had a chest CT scan at Thomas Memorial Hospital by A. Jane Maloof, M.D. per the order of Dr. Rashid.  (Tr. at 423.)  Dr. Maloof reported: "IMPRESSION: Negative CT imaging of the chest aside from mild aneurysmal dilation ascending thoracic aorta."  Id.

On July 23, 2008, Stephen B. Nutter, M.D. provided an internal medicine examination of Claimant for the West Virginia Disability Determination Division.  (Tr. at 367-71.)  Dr. Nutter described Claimant's history of present illness:

9

> The claimant reports a history of cva. This occurred in 1/31/08. Initially he presented with left sided hemiparesis. The claimant was hospitalized, followed by inpatient rehab and also at a nursing home. Currently he are [sic] complaining of left sided weakness. Chart notes do indicate an admission for a stroke. He reports he was told the stroke was due to hypertension. He has had it for 10 years. He was not on medication until 11/07 when he reports he had an MI [Myocardial Infarction] and then was not compliant with treatment and ended up having a stroke. He takes his medication now. He indicates they found a thoracic aortic aneurysm when doing his workup in 11/07 and are watching it for now. He denies chest pain. He has had headaches since the stroke. The claimant reports headaches occurring 1 times per week. On a scale of 1-10 the headaches are rated 9. The headache causes photophobia.

(Tr. at 367.)

Dr. Nutter's impression was "1. CVA. 2. Degenerative arthritis." (Tr. at 370.) He concluded: "He had some evidence of left sided weakness. No other deficits were noted. His BP was under control today. The claimant reports problems with joint pain....there is joint pain, tenderness and decreased ROM. There is no synovial thickening, periarticular swelling, nodules or contractures consistent with rheumatoid arthritis." Id.

On August 15, 2008, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work with "only occasional pushing/pulling with left extremities due to weakness"; postural limitations marked as occasionally climbing ramp/stairs, stooping and kneeling and never climbing ladder/rope/scaffolds, balancing, crouching or crawling due to "left-sided weakness & DJD"; manipulative limitations in reaching all directions (including overhead) and fingering (fine manipulation) "with left hand"; no visual or communicative limitations; and environmental limitations being to avoid concentrated exposure to extreme temperatures, vibration, fumes, and to avoid even moderate exposure to hazards citing "aortic aneurysm, left-sided weakness & HTN [hypertension]." (Tr. at 393-96.) The

10

evaluator, Gregory Langford, noted:

> ADL's: no self-care deficits but states has modified his ADL's to accommodate his limitations; able to do laundry & some mowing; drives & shops;  left arm & leg affect ability to lift, squat, bend, reach, kneel & climb stairs.

> Credibility: sx [symptoms] & limitations consistent w/ [with] MER [medical evidence of record]; does have residual weakness from stroke, aortic aneurysm & DJD [Degenerative Joint Disease] that would affect his ability to exert himself but these impairments do not appear to met or = any appropriate listing; RFC reduced to light w/ restrictions & limitations as outlined on prev. [previous]  pp. [pages]

(Tr.  at 397.)

On November 17, 2008, Claimant had a follow-up visit at the WV Heart and Vascular Institute with Howard K.  Fletcher, CFNP (Certified Family Nurse Practitioner).  (Tr.  at 425-27.)  Mr.  Fletcher reported:

> Overall the patient has been doing well.  The hypertension has been well controlled on the patient's current medications...

> He has no current symptoms.  The patient denies chest pain, dyspnea, syncope, bilateral lower edema, coughing, wheezing, and lightheadedness...

> The patient states he has been compliant with recommended diet, level of exercise and medications.  He has not had any significant changes in weight since the last visit.  The patient has been exercising minimally.  He continues to use tobacco despite recommendations to stop entirely...

> Today's EKG is unchanged from previous EKG.

> Neurologic:
> Gait and Station: normal gait, able to undergo exercise testing or rehabilitation, able to stand without difficulty, Can tolerate exercise testing.

> Assessment:
> •     Aneurysm, without rupture, AAA 441.4
> •     Benign HTN [hypertension] 401.1
> •     Mixed Hyperlipidemia 272.2

(Tr.  at 425-27.)

11

On December 3, 2008, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work with unlimited pushing/pulling "other than as shown for lift and/or carry" which was a 20 pound maximum; postural limitations marked "occasionally" were climbing ramp/stairs, balancing, stooping, kneeling, crouching and crawling; marked "never" was climbing ladder/rope/scaffolds; the only manipulative limitation marked was "handling (gross manipulation)", the other categories were marked "unlimited" along with a note stating "Mild weakness of Lt arm & leg, manipulations preserved.  Rt arm unlimited."; no visual or communicative limitations were found; and the environmental limitations were unlimited with the exceptions to avoid even moderate exposure to hazards and to avoid concentrated exposures to extreme temperatures and vibration. (Tr.  at 411-14.)  The evaluator, Fulvio Franyutti, M.D. noted:

> ADLs: No self care deficits, but reports he has modified his ADLs to accommodate his limitations...
>
> 45 year old claimant with allegations of stroke, left hemiparesis, hypertension, and aortic aneurysm.  He did have a CVA in January 2008.  He has a slightly limping gait and had a cane at the CE, although the source noted he did not require the use of a handheld device.  He was stable at station.  There was some crepitus of the knees and left knee and shoulder showed pain with movement and tenderness.  He reports the ability to do laundry, drive, mow some grass, drive, shop, and is independent in ADLs. He reports his left arm affects the ability to lift, squat, bend, reach, kneel, and climb stairs.  He does have some mild weakness of the left side at 4/5 strength.  He has normal strength on the right side.  The MER supports partial credibility...
>
> Stephen Nutter, M.D., from CE report: I would not trust him to balance or work around unprotected heights.
>
> I agree with above.

(Tr.  at 415-16.)

On March 30, 2009, Kalapala S. Rao, M.D., provided an evaluation of Claimant wherein he stated that Claimant's chief complaint was "[p]ain left hip and pain left shoulder for one year. ..Functionally independent in all activities of daily living.  Uses cane on PRN [Pro Re Nata, Latin: as needed] basis.  Does house work." (Tr. at 419.)  Dr. Rao stated that his treatment plan was: "Discussed chronic pain management, side effects addition explained; No driving while on medications explained; Drug screening and pill count explained; Vicodin 5/500 PO TID #90; Cannot take NSAID; Wall climbing exercises; Ice/Heat; ROM exercises; Lidoderm patch on left shoulder and left hip...; X-ray C Spine, LS Spine."  (Tr. at 421.)  Illegible handwritten notes also indicate that Dr. Rao treated Claimant on April 28, 2009, May 12, 2009, July 7, 2009, August 4, 2009, and August 17, 2009.  (Tr. at 418, 464.)

On August 18, 2009, Dr. Rao completed a form titled "Stroke Residual Functional Capacity Questionnaire." (Tr. at 465-70.)  Dr. Rao stated that Claimant had an "Ischemic Left Cerebral [illegible] 02-01-2008.  Other diagnoses: HTN, Hyperlipidemia, Thoracic aortic aneurysm, Depression, Left shoulder (illegible).  Prognosis: Chronic - Fair.  Clinical Findings: Weakness L (illegible) due to pain."  (Tr. at 465.) He marked Claimant's symptoms as "balance problems, poor coordination; headaches; weakness; slight paralysis; unstable walking; pain; fatigue."  Id.  Dr. Rao further noted that Claimant was not a malingerer, had "significant and persistent disorganization of motor function in two extremities  resulting in sustained disturbance of gross and dexterous movement or gait and station....has (illegible) coordination of left (illegible), left leg - very mild...occasionally uses cane."  (Tr. at 466-67.)  He also marked "Yes" to these questions: Did your patient have a stroke?; Do emotional factors contribute to the severity of your patient's symptoms

13

and functional limitations?; Are your patient's impairments (physical impairments plus any emotional impairments) reasonably consistent with the symptoms and functional limitations described in this evaluation?; Have your patient's impairments lasted or can they be expected to last at least twelve months?; Does your patient need a job which permits shifting positions at will from sitting, standing or walking?; Will your patient sometimes need to take unscheduled breaks during an 8 hour working day? ("every 2 hours" and rest "10 minutes" before returning to work); Does your patient have significant limitations in doing repetitive reaching, handling or fingering? ("patient can use hands/fingers/arms... Right: 100%...Left: 0% "); Are your patient's impairments likely to produce "good days" and "bad days"? (Tr. at 465-69.) Dr. Rao marked "Often" to the question: How often is your patient's experience of pain, fatigue or other symptoms severe enough to interfere with attention and concentration? (Tr. at 466.) He stated "3-4 blocks" to the question: How many city blocks can your patient walk without rest? Id. He circled "1-2 hours" in response to the time Claimant can continuously sit  at one time, "30-45 minutes" to the time Claimant can stand at one time, and that "about 4 hours" is the time Claimant can sit and stand/walk total in an 8 hour working day (with normal breaks). (Tr. at 466-67.) He opined that Claimant can "occasionally" lift less than 10 pounds and "never" lift 10 pounds or more. (Tr. at 468.) He stated "0%" to Claimant's ability to stoop and crouch. Id. Dr. Rao marked that Claimant should avoid concentrated exposure to extreme temperatures, wetness, humidity, and hazards, but had no restriction regarding noise, fumes, odors, dusts, gases, poor ventilation, etc. (Tr. at 469.) He marked that Claimant is "[c]apable of low stress jobs" and would on average be absent from work "about twice a month" as a result of the impairments or treatment because he "suffers from stroke, HTN, (illegible), L

14

shoulder impingement." (Tr. at 469-70.)

The record includes two lists of the medications that Claimant obtained from Rite Aid Pharmacy from December 13, 2006 to August 3, 2009 and from January 9, 2009 to June 11, 2009. (Tr. at 428-32, 444-55.)

Psychiatric Evidence

On July 29, 2008, a State agency medical source completed a Mental Status Evaluation of Claimant. (Tr. at 372-77.) The evaluator, Paul A. Dunn, Ph.D., found:

> MENTAL STATUS EXAMINATION: Appearance: As mentioned, Mr. Balis was somewhat disheveled in his appearance. He was casually dressed...Attitude/Behavior: He was cooperative in the exam and engaged in occasional direct eye contact. There was little voluntary conversation. He answered the questions as they were presented in a cooperative manner. Speech: His tone was low. His rhythm was within normal limits. He had no particular difficulty putting sentences together or with work finding. There was no slurring of his speech. Orientation: He was oriented to person, place, time, and circumstance. Immediate Memory: Within normal limits as he was able to give back four of four words that were given to him by this examiner. Recent Memory: Mildly deficient in that he was only able to give back three of the four words after a 15-minute delay. Remote Memory: Long-term memory was below average because he had some difficulty recalling details of his history especially with respect to his vocational history. Mood: Depressed. Affect: Flat. Thought Process/Content: He displayed no particular problems with thought content nor thought processes. He did not report any history of auditory or visual hallucinations, delusion, or other related symptoms of psychopathology. Insight: Below average. He did realize that he is depressed, but had little idea about what he might be able to do about his depression. Psychomotor Behavior: As mentioned, there was a general background of slowed behavior and movement, but at one point he seemed to be somewhat restless in his movement. Judgment: Within normal limits, based on the claimant receiving a score of 10 on the Comprehensive subtest of the WAIS-III. Concentration: Within normal limits based on the claimant obtaining a standard score of 8 on the Digit Span subtest of the WAIS-III. Persistence: Within normal limits. Pace: Slow.
>
> SOCIAL FUNCTIONING: During the Evaluation: Social interaction was somewhat dulled in the evaluation secondary to his moderate level of depression and low level of interaction. Self-Reported: ... He has not been socializing outside of his family much. He goes shopping with them and goes

15

out into the community, but there is not much interaction with friends in the community other than his family.  He does have some phone contact and visits with family members.

DAILY ACTIVITIES: He has reduced number of chores that he does allegedly because of the weakness in his arm and leg, though he did say that he had been cutting some wood for sale.  He does some lawn work and he does participate in helping with meals.  He walks around his property.  He spends a lot of time watching television.  He takes care of his own hygiene and dressing.  He does help with the laundry.  His wife asserts that all of his functioning is done at a much slower pace than before he had his stroke.

DIAGNOSTIC IMPRESSION:

| Axis I | 296.22 | Major Depressive Disorder, Single Episode, Moderate. |
| Axis II | V71.09 | No Diagnosis. |
| Axis III | | None. |

DIAGNOSTIC RATIONALE: The diagnosis of major depressive disorder is given based on several different symptoms that he mentions in the evaluation and his overall presentation in the examination.

PROGNOSIS: Guarded to fair.

RECOMMENDATION: Mr.  Balis ought to be referred for treatment of his depression.

CAPABILITY: If benefits would be forth coming, Mr.  Balis appears to be capable of adequately managing his finances.

(Tr.  at 374-77.)

On August 14, 2008, a State agency medical source completed a Psychiatric Review Technique form for the time period of "02/01/2008 to current."  (Tr.  at 378.)  The evaluator, Frank Roman, Ed.  D., found Claimant's impairment was not severe regarding his affective disorder.  Id.  He found Claimant had mild limitation regarding restriction of activities of daily living, difficulties in maintaining social functioning and maintaining concentration, persistence, or pace; and no episodes of decompensation.  (Tr.  at 388.)  He stated that the evidence does not establish the presence of "C" criteria.  (Tr.  at 389.)  Dr.

Roman concluded: "Based on MER, claimant is credible.  He has depression secondary to health concerns and loss of income now that he is not working.  He is independent in his ADLS [activities of daily living] and able to be out in public when he so desired.  His mental impairments are rated nonsevere."  (Tr.  at 390.)

On December 2, 2008, Joseph A.  Shaver, Ph.D., Psychology, stated in a form marked "Case Analysis": "I have reviewed all pertinent information in case file and the assessment of 8/14/08 is affirmed as written."  (Tr.  at 409.)

On August 11, 2009, Janice Blake, M.A., licensed psychologist, reported that she had interviewed Claimant and completed a Mental Status Exam, a review of records and administered six various intelligence and behavior tests on Claimant.  (Tr. at 433-43.)  Ms. Blake reported:

> CLINICAL INTERVIEW/MENTAL STATUS EXAM: The client arrived on time for all appointments.  He was dressed in casual, clean clothing which was appropriate for his age and the situation.  He is reported 5'9" in height and 250 pounds in weight.  He was noted to have brown hair, long curly beard and mustache, and brown eyes which gave his overall appearance a disheveled appearance.
>
> Rapport was not easily established with the client, however, he did answer questions that were asked of him with the exception of mental health symptoms.   He did finally report "anxiety attacks" showing some embarrassment when reporting.  It should be noted that he did this only after validating symptoms on the BAI.  Speech was relevant and coherent with the ability to communicate considered average.   Psychomotor activity was elevated with the client noted to shift positions often.  Anxiety level appeared elevated to the situation.
>
> The claimant came to the interview with a constricted range of affect with mood (observed) depressed. Stream of thought appeared logical, sequential, and coherent in nature.  He denied excessive obsessions, compulsions, or phobias.  No evidence was noted of hallucinations or delusions and the client denied homicidal/suicidal ideations. Immediate memory functions appeared to be intact, however, remote memory functions appeared moderately impaired based on an inability to recall historical data.   Estimated

17

intelligence appeared to be in the average range of intellectual functioning...

DSM-IV DIAGNOSTIC IMPRESSIONS:

| | | |
|---|---|---|
| Axis I: | 296.33 | Major Depressive Disorder, Recurrent, Severe |
| | 300.01 | Panic Disorder without Agoraphobia |
| | R/O | Dementia due to CVA |
| Axis II: | V71.09 | No Diagnosis. |
| Axis III: | | CVA with remaining left side hemiparesis, Hypertension, aortic aneurysm, chronic pain in left shoulder, hip, and knee since stroke (by client report). |
| Axis IV: | | The client is divorced with minimal contact with his children. He reported his mother is deceased. He is unemployed, living with his father, and reported he has "lost everything." |
| Axis V: | | GAF [Global Assessment of Functioning] =55. |

TREATMENT RECOMMENDATIONS:

1) The client would most likely benefit from continued individual psychotherapy to deal with symptoms of anxiety and depression. He reported that he has "crazy thoughts" indicating that "sometimes I think you'd be better off...," and reporting on the BDI-II that he thinks about killing himself but would not. He reported he is taking Paxil 20 mg with it "kind of" helping. Intervention, therefore, most likely should be immediate and directed at helping the client regain hope while adjusting to any remaining physical and/or functional deficits from the stroke and aortic aneurysm that he reported has been found. He indicated that he suffered from a significant amount of anxiety also, stating that he has symptoms that meet criteria for panic disorder. He also reported that he worries that something else will happen to him, therefore, therapy should also explore if this worry could be the root of his panic symptoms and if so, help the client understand the connection and teach cognitive methods to reduce and/or control.

2) The client would most likely benefit from a referral for psychiatric consultation. He stated that the psychologist who completed his evaluation for DDS had recommended he have his medical doctor prescribe Paxil. He reported that Paxil had minimal effect and his scores on the BDI-II continue to be in the severe range, therefore, a referral for psychiatric intervention appears appropriate.

3) Per referral questions, it does appear that there are mental health issues that would interfere with the client gaining and maintaining employment at this time. He reported symptoms of depression that are in the severe range. He also reported symptoms of anxiety that meet criteria for Panic Disorder which would more so interfere with employment productivity, reliability, and predictability. He stated that he worries a great deal that something else will

happen to him and it is reasonable to believe that the client would be concerned that work activity would negatively affect his health, particularly the aneurysm. On the KBIT-2 the client received a score in the below average range on the Nonverbal Subtest and a score in the average range on the Verbal Subtest. The Nonverbal testing measures the individual's ability to solve new, novel, and complex problems by assessing an individual's abilities to perceive relationships and complete visual analogies. (Analogy reasoning in the ability to make an inference that certain resemblances imply further similarity. Serial Reasoning is the ability to recognize what is appearing in a series of continuous parts at regular intervals). The Verbal Subtest measures previously learned knowledge. The client deficits on the Nonverbal Subtest scores, therefore, could reflect deficits from the stroke and may warrant further assessment as the COGNISTAT is only a screening instrument.

(Tr. at 436, 439-40.)

On August 11, 2009, Ms. Blake also completed a form titled "Medical Opinion Re: Ability to do Work-Related Activities (Mental)." (Tr. at 441-43.) Ms. Blake marked on the form that Claimant is "Unlimited or Very Good" in these "abilities and aptitudes needed to do unskilled work": "Remember work-like procedures; Understand and remember very short and simple instructions; Carry out very short and simple instructions; Ask simple questions or request assistance; Be aware of normal hazards and take appropriate precautions." (Tr. at 441.) She marked that Claimant is "Limited but satisfactory" in these abilities: "Maintain attention for two hour segment; Make simple work-related decisions; Respond appropriately to changes in a routine work setting." Id. She marked that Claimant is "Seriously limited, but not precluded" in these abilities: "Work in coordination with or proximity to others without being unduly distracted; Accept instructions and respond appropriately to criticism from supervisors; Get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes." Id. She marked that Claimant is "Unable to meet competitive standards" in these abilities: "Maintain regular attendance

19

and be punctual within customary, usually strict tolerances; Sustain an ordinary routine without special supervision; Complete a normal workday and workweek without interruptions from psychologically based symptoms; Perform at a consistent pace without an unreasonable number and length of rest periods; Deal with normal work stress." Id. Ms. Blake noted:  "The client reported significant symptoms of anxiety including fear of the worst happening and fear of losing control.  He stated he worried excessively about something else happening to him also." Id.

Regarding mental abilities and aptitudes needed to do semiskilled and skilled work, Ms.  Blake marked on the form that Claimant was "Unlimited or Very Good" in his ability to "Understand and remember detailed instructions;" "Limited but satisfactory" in his ability to "Set realistic goals or make plans independently of others;" and "Seriously limited but not precluded" in his ability to "Carry out detailed instructions."  (Tr.  at 442.)  Ms. Blake noted: "Same as above for anxiety.  The client also scored 11 points lower on nonverbal abilities/skills during testing."  Id.

Regarding mental abilities and aptitudes needed to do particular types of jobs, Ms. Blake marked on the form that Claimant was "Unlimited or very good" in his ability to "Travel to unfamiliar places;" "Limited but satisfactory" in his ability to "Interact appropriately with the general public;" and "Seriously limited but not precluded" in his ability to "Maintain socially appropriate behavior." Id.  She also marked that Claimant can manage benefits in his own best benefits and that it was "unknown" how many days Claimant would be absent from work due to his impairments or treatment "as anxiety is driven by worry.  Negative thoughts and fight/flight response."  (Tr.  at 443.)

Evidence Submitted After the ALJ's Decision & Incorporated into the Record by the AC

20

On February 23, 2010, John R.  Atkinson, Jr., MA, provided a Psychological Evaluation of Claimant.  (Tr.  at 472-85.)  Mr.  Atkinson noted in his Mental Status Examination:

> **Appearance**:  In appearance, the patient was noted to be a good size, moderately obese, right-handed male of 46 years with long-brown hair and beard and brown eyes.  **Attitude/Behavior**:  The patient's attitude was vague, careless and restless.  **Social**: Social rapport was uneasy.  **Speech**: Speech patterns tended to be coherent but hesitant and unsure.  **Orientation**: Today the patient was well oriented as to time, place and person.  **Mood**: Observed mood was subdued.  **Affect**: Restricted, the patient had a flat, expressionless manner, which is often seen in organic individuals. **Thought Process**: Associations are relevant and the stream of thought is slowed.  **Thought Content**: No distortions of thought content were noted. **Perceptual**: The patient denies any hallucinations or illusions.  **Insight**: Fair to poor.  **Judgment**: Within normal limits based upon a Comprehension Subtest Scale Score of 10.  **Immediate Memory**: Within normal limits, the patient immediately recalled four of four words.  **Remote Memory**: Slightly inexact as assessed by history recall; upon further inquiry, the patient states that he has problems remembering names, phone numbers and addresses, misplaces things but he denies things like putting food on the stove, forgetting it is there and burning it, driving by destinations, denies familiar surroundings looking strange, loss of time or forgetting the content of tv programs.  His memory problems appear to be mild at this time.  **Concentration**: Mildly impaired based upon Arithmetic Raw Score of 10, Scale score of 7 and Standard Score of 82.  **Attention**: Normal based upon a Digit Span Raw Score of 14, Scale Score of 8 and Standard Score of 88.  **Abstract Reasoning**: Normal based upon a Similarities Raw Score of 18, Scale Score of 8 and a Standard Score of 88.  **Psychomotor Behavior**: Normal based on clinical observation.  **Persistence**: Fair as demonstrated by examination behavior.  **Pace**: Average as observed during the examination.  **Social Functioning**: Within normal limits as observed by social interaction.
>
> **Social Functioning (self-reported)**: The patient does not attend church, goes to visit friends about two times a month and they come to see him about once a week.  He goes to visit relatives once a month and they come to see him, "it varies."  He states he see his children maybe one time a year.  As to entertainment outside the home, he goes out to dinner with friends occasionally.  Interpersonal relationships, by self-report, were always marked by an outgoing, gregarious nature.  In his approach to inquiry, the patient was reticent and had problems expressing himself.

21

(Tr. at 476-78.)

Regarding Claimant's WAIS-III Scores, Mr. Atkinson stated:

Verbal IQ 90, Performance IQ 77, Full Scale IQ 83...

These scores are felt to be valid due to average effort. It is noted that the patient's verbal score is significantly above his performance score, which would be expected in an individual with organic brain impairment. The patient has a ninth grade literacy level, was never in special education and onset is presumed to be at the time of his stroke.

(Tr. at 478.)

Mr. Atkinson concluded:

The patient is a 46-year old male who appears to be somewhat passive aggressive in his personality structure who has a history of alcohol abuse, divorce, etc., but whose functioning were basically within the broad limits of normality up until the time when he had a CVA with left-side hemiparesis. The patient shows mild but noticeable impairment in most areas of intellectual functioning but much worse on performance items and clearly shows that he continues to have brain tissue dysfunction and organicity. It is noted that in such individuals when they are placed in pressured or stressful situations, their impairment become greatly exacerbated, they tend to become rattled, give up, get angry and attempt to cover up and deny their deficits. While it is not felt that the patient's impairment rises to the level of frank dementia, it does rise to the level of cognitive dysfunction and, of course, he continues to be depressed despite whatever treatment he has been getting....It is recommended that the patient been seen by an actual psychiatrist or even better, a neuropsychiatrist for formal treatment. It is not felt that he has the capacity to sustain effort in a meaningful, employment situation.

DIAGNOSIS:

| | | |
|---|---|---|
| Axis I | 294.9 | Cognitive Disorder - NOS (S/P CVA) |
| | 311. | Depressive Disorder - NOS |
| Axis II | V71.09 | No Diagnosis |
| Axis III | | See Medical Reports |
| Axis IV | | Relational Problems, Housing Problems, Financial Problems, Health Issues |
| Axis V | | GAF = 55, Moderate to Serious Impairment, Current and Past Year; this is for whole-person impairment, both physical and psychological. |

22

RATIONALE:

294.9   Manifested by multiple indicators on psychological testing and in the clinical interview of organicity and intellectual impairment following a cardiovascular accident and this is most pronounced in performance areas and accompanied by apathy.

311.     Manifested by premorbid depression beginning with a divorce several years ago and accompanied by symptomatic alcohol abuse, continues to be depressed with suicidal ideation, feels sad, has problems sleeping, is irritable and more emotional since his CVA, has low feelings of self-worth, low energy, feels slowed down and sluggish. He displays ongoing suicidal ideation but no attempt.

PROGNOSIS: Uncertain

CAPABILITY: If benefits were granted, the patient would be able to manage his own financial affairs including money payments.

(Tr. at 479-80.)

On March 6, 2010, Mr. Atkinson completed a form titled "Medical Source Statement of Ability to do Work-related Activities (Mental)". (Tr. at 483-85.) He marked that Claimant was not limited in his abilities to understand and remember simple instructions; to carry out simple instructions, or to make judgments on simple work-related decisions. (Tr. at 483.) He marked that Claimant had "moderate" limitations in his ability to understand and remember complex instructions, carry out complex instructions, and to make judgments on complex work-related decisions, due to "HS [history] of CVA w/ Residuals." Id. He further checked that Claimant had "moderate" restriction in his ability to "[i]nteract appropriately with the public...with supervision...with co-workers" and to "[r]espond appropriately to usual work situations and to changes in a routine work setting." (Tr. at 484.) Finally, Mr. Atkinson marked "No" to the question: "Are there any other capabilities affected by the impairment?" but noted "motivation due to depression." Id.

23

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in the evaluation of the opinions of Claimant's medical sources, Dr. Rao and Ms. Blake. (Pl.'s Br. at 12-16; Pl.'s Reply Br. at 1-2.)   The Commissioner responds that  the ALJ properly evaluated the medical source opinions. (Def.'s Br. at 12-18.)

<u>Medical Source Opinions</u>

Claimant argues that the ALJ's finding concerning Claimant's limitations is not supported by substantial evidence because he relied on the opinions of Dr. Franyutti and Dr. Marshall, physicians who did not examine Claimant, over the opinion of Dr. Rao, the treating physician. (Pl.'s Br. at 13-17.)  Claimant further asserts that the ALJ erred in relying upon the opinion of Dr. Blair, a non-examining neuropsychiatrist, rather than Ms. Blake, an examining psychologist.  (Pl.'s Br. at 17-18.)    Specifically, Claimant asserts:

> The ALJ's finding concerning Mr. Balis's limitations is not supported by substantial evidence...In making his decision concerning the weight to be accorded the various medical opinions, the ALJ did not apply the legal standard mandated by 20 C.F.R. § 404.1527(d).  Furthermore, the opinion of a nonexamining physician cannot be substantial evidence when it is contradicted by all the other evidence of record.  *Martin v.  Secretary of Health, Education and Welfare*, 492 F.2d 905, 908 (4th Cir.  1974) ("a non-examining physician's opinion, by itself, cannot serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record.")...

> An analysis of the ALJ's decision based on the standards for weighing opinions shows that he did not apply proper legal standards in choosing to credit the opinions of the nonexamining physicians over the opinions of Dr. Rao.

> The Commissioner's regulations outline six factors to be considered when the ALJ is determining the weight to be accorded medical opinion evidence: examining relationship, treatment relationship, supportability, consistency,

specialization and other factors.  20 C.F.R. § 404.1527(d)(2010).

Nowhere in the ALJ's decision does he explicitly apply these factors in deciding to give greater weight to the testimony of Dr. Marshall and the opinion of Dr. Franyutti.  A comparison of these opinions using these standards shows that the ALJ erred in giving less weight to the opinion of Dr. Rao.

Obviously neither Dr. Marshall nor Dr. Franyutti was in an examining or treating relationship with Mr. Balis.  In addition, the opinions of Dr. Marshall and Dr. Franyutti are inconsistent with each other.  Dr. Marshall indicated that Mr. Balis was limited in pushing and pulling, at least with the left upper extremity, while Dr. Franyutti found no such limitation.  (Tr. 51, 411).

Furthermore, Dr. Marshall's testimony that it was "absolute nonsense" that Mr. Balis had an aneurysm is not supported by the objective medical evidence.  A CT scan of the chest, interpreted by Dr. Rashid, Mr. Balis's cardiologist, on June 23, 2008, found a thoracic aortic aneurysm.  (Tr. 366).  In fact, treatment of the stroke was limited due to Mr. Balis's history of an aneurysm.  (Tr. 281).  The Court should also note that the ALJ found as a fact that Mr. Balis had a thoracic aortic aneurysm.  (Tr. 15, Finding No. 3).

Even the explicit reason given by the ALJ for discrediting Dr. Rao's opinion is not supported by the record.  The Judge indicated that Dr. Rao's opinions were entitled to little weight because "they are not supported by the evidence of record, including the claimant's own report of daily activities."  (Tr. 25).

Given that Mr. Balis was given little opportunity to testify at the hearing concerning his daily activities, the ALJ must have relied on either the function reports completed by Mr. Balis and his father or boilerplate language in a decision-writing template in making this assumption.  The function reports, however, are very consistent with the limitations noted by Dr. Rao...

The ALJ's reliance on Dr. Blair's opinion over the opinion of Ms. Blake, an examining psychologist is also misplaced.  Dr. Blair stated that Mr. Balis suffered only from "mild, maybe moderate depression."  (Tr. 45)...

Subsequent to the Judge's decision, John Atkinson, a licensed psychologist, evaluated Mr. Balis and administered an MMPI.  Because the Appeals Council incorporated Mr. Atkinson's report into the administrative record, (Tr. 5), the Court must consider it in deciding whether the ALJ's finding concerning Mr. Balis's mental limitations is supported by substantial evidence. *Wilkins v. Secretary*, 953 F. 2d 93, 96 (4th Cir. 1996)...

The ALJ's finding concerning Mr. Balis's residual functional capacity is not supported by substantial evidence. In deciding to give greater weight to the opinions of Drs. Blair, Marshall and Franyutti, nonexamining physicians, than to the opinions of Ms. Blake and Dr. Rao, the Judge failed to properly apply the legal standards in the Commissioner's regulations at 20 C.F.R. § 404.1527(d).

Normally such an error would require remand for proper findings of fact. In this case, however, the substantial evidence of record shows that Mr. Balis cannot perform substantial gainful activity. Dr. Rao indicated that he could not lift even ten pounds and could only sit and stand/walk four hours in an eight-hour day. (Tr. 466-467). Ms. McFann, the vocational expert who testified at Mr. Balis's hearing, stated that if the claimant were limited to lifting ten pounds with either upper extremity, there would be no jobs available. (Tr. 63). Therefore, the Court should reverse the decision of the Commissioner and remand this matter only for payment of benefits.

(Pl.'s Br. at 13-18.)

The Commissioner argues that substantial evidence supports the ALJ's evaluation of Dr. Rao's and Ms. Blake's opinions. (Def.'s Br. at 12-18.) Specifically, the Commissioner asserts:

Plaintiff's sole argument is that the ALJ erred by not properly evaluating his medical sources' opinions. Just because Plaintiff's medical sources offered opinions in this case, however, does not mean that the ALJ had to accept them uncritically. The objective evidence of record, including, but not limited to, Plaintiff's robust daily activities, the state agency medical opinions, and the medical sources' own notes, is inconsistent with the opinions of his medical sources....

In making this argument, Plaintiff impermissibly asks the Court to re-weigh these opinions in his favor. When reviewing the record for substantial evidence, however, the Court may not re-weigh the evidence of record or substitute its own conclusions for those of the ALJ. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1990). Likewise, the ALJ, not this Court, is the sole adjudicator as to how much weight to give to the medical opinions in a case. 20 C.F.R. §§ 404.1527(d), 416.927(d). In fact, as he did here, the ALJ is required to review the record and choose among conflicting evidence. Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)(stating that "when the medical testimony or conclusions are conflicting, the ALJ is not only entitled but required to choose between them"). For this reason alone, Plaintiff's argument should be rejected.

26

With respect to Dr. Rao's opinion specifically, the ALJ properly evaluated this opinion for the following three reasons.

First, when attacking the ALJ's evaluation of Dr. Rao's opinion, Plaintiff ignores that this opinion is inconsistent with the objective evidence of record (Pl.'s Br. at 12-17)...Here Dr. Rao's opinion concerning the impact of Plaintiff's stroke on his functioning is inconsistent with the following evidence of record...(citing six instances)

Second, Plaintiff's robust daily activities are also inconsistent with Dr. Rao's opinion. For example, Plaintiff admitted - to Dr. Rao - that he is functionally independent in all activities of daily living (Tr. 419). To his end, Plaintiff prepares meals, does laundry, and gardens or mows once or twice a week for 2-3 hours at a time (Tr. 169, 178, 436). He also goes outside every day, takes walks, and drives a car (Tr. 170, 179). Additionally, Plaintiff shops in stores for clothing and food at least once a week, and has no problems doing this alone (Tr. 170, 179, 436). Therefore, Plaintiff's daily activities greatly undermine Dr. Rao's opinion.

Third, Dr. Rao did not provide any clinical or objective findings to support his opinion (Tr. 16). In fact, Dr. Rao's only legible treatment notes reveal that the strength of Plaintiff's right arm was 5/5 and left was 4/5; the range of motion of his back was normal; a SLRT and Patrick's sign test were normal for both of his legs; and the range of motion and muscle strength of both of Plaintiff's legs were normal (Tr. 420). Thus, Dr. Rao's own treatment notes do not support his conclusory opinion...

Turning to Ms. Blake, the Court should also reject Plaintiff's attack on the ALJ's evaluation of her opinion for the following four reasons.

First, as with Dr. Rao, the evidence of record undermines Ms. Blake's opinion...(citing five instances)

Second, as Dr. Blair recognized, Ms. Blake's opinion is based primarily on Plaintiff's subjective complaints/self-reports (Tr. 39-44)...In fact, Dr. Blair explained that Plaintiff was not given objective tests to validate his psychological condition, and stated that Plaintiff's diagnostic results contained no validity indicators (Tr. 40-41, 43). Because Ms. Blake's opinion is based on Plaintiff's subjective complaints/self-reports, it fails to support Plaintiff's argument. See 20 C.F.R. §§ 404.1528(a), 416.928(a) ("Your statements alone are not enough to establish that there is a physical or mental impairment.")

Third, Ms. Blake's opinion is undermined by Plaintiff's conservative treatment...As Dr. Blair recognized, Plaintiff has never had any inpatient or

outpatient psychiatric treatment (Tr. 37).

Fourth, in an effort to bolster, Ms. Blake's opinion, Plaintiff points to Mr. Atkinson's medical source statement and evaluation, which he submitted several months after the ALJ's decision. These material, however, do not refute the ALJ's RFC assessment or conclusion that Plaintiff is not disabled under the Act.

In his medical source statement, Mr. Atkinson concludes that Plaintiff has, at most, moderate limitations in his ability to perform work-related activities (Tr. 483-84). The medical source statement defines "Moderate" as an individual having more than a slight limitation, but retaining the ability to function satisfactorily (Tr. 483).

(Def.'s Br. at 1, 12-17.)

Claimant responds that the Commissioner "proffer[s] a different and more detailed rationale for disregarding the opinions of Dr. Kalapala Rao and Ms. Janice Blake than was found in the ALJ's decision. The Court may affirm the ALJ's decision based on only reasons stated in the decision." (Pl.'s Reply Br. at 1.) Claimant further reiterates allegations that the ALJ failed to apply the standards in 20 C.F.R. § 404.1527(d) in determining the weight to be given to the various medical opinions of record, particularly the opinion of Dr. Robert Marshall, who denied that Claimant had an aortic aneurysm "despite the existence of objective imaging studies showing he had such a condition." (Pl.'s Reply Br. at 2.)

In an extensive 17-page decision, the ALJ considered the entire record and made these findings regarding the medical opinions of Drs. Nutter, Franyutti, Rao, and Marshall about Claimant's physical impairments and the opinions of Drs. Roman, Shaver, Blair, and Ms. Blake about Claimant's mental impairments:

As for the opinion evidence, on February 5, 2008, an examining physician reported the claimant could not ambulate or use his left arm or left leg (Exhibit 2F). This opinion is entitled to significant weight only to the extent it relates to the immediate time period after the claimant suffered his cerebrovascular accident. There is no evidence of continuance of these severe

limitations for a continuous 12-month period.

On July 23, 2008, Stephen B. Nutter, M.D., opined the claimant could not be trusted to balance or work around unprotected heights (Exhibit 6F). Dr. Nutter's opinion is entitled to significant weight as it is supported by the entire evidence of record.

On December 3, 2008, Fulvio Franyutti, M.D., a State agency medical expert, reviewed the evidence of record and opined the claimant could lift and carry 20 pounds occasionally and 10 pounds frequently. He felt he could stand and/or walk about six hours and sit about six hours during an eight-hour workday. He felt he could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. He felt he could never climb ladders, ropes or scaffolds. He felt he had mild limitation in his ability to handle with his left arm/hand. Dr. Franyutti opined the claimant must avoid concentrated exposure to extreme cold, extreme heat and vibration. Dr. Franyutti further opined the claimant must avoid even moderate exposure to hazards, such as machinery and heights (Exhibit 12F). The opinions of Dr. Franyutti are entitled to significant weight to the extent they are consistent with the above residual functional capacity. When giving the claimant the full benefit of doubt, the undersigned finds greater limitations as reflected above.

On August 18, 2009, Kalapala S. Rao, M.D., the claimant's treating physician, opined the claimant could walk three to four blocks without resting. He felt he could sit one to two hours at a time and could stand 30-45 minutes at a time. He felt the claimant could sit and stand/walk a total of about four hours during an eight-hour workday. He felt the claimant often has pain, fatigue or other symptoms severe enough to interfere with his attention and concentration. He felt the claimant requires unscheduled 10-minute breaks every two hours. Dr. Rao opined the claimant must occasionally use a cane or other assistive device when engaging in occasional standing/walking. He felt he could occasionally lift and carry less than 1o pounds. He felt the claimant could never use his left upper extremity for grasping, turning or twisting objects, fine manipulation or reaching, including overhead. He felt the claimant could never stoop or crouch. He felt the claimant must avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity and hazards, such as machinery and heights. He felt the claimant is capable of low stress jobs and that his impairments were likely to produce good days and bad days. Dr. Rao further opined the claimant would likely be absent from work about twice a month as a result of his impairments and treatment (Exhibit 20F). The opinions of Dr. Rao are entitled to little weight as they are not supported by the evidence of record, including the claimant's own report of daily activities.

Robert Marshall, M.D., a medical expert, reviewed the evidence of record and

testified the claimant sought emergency room treatment in November 2007 with chest pain. His blood pressure was very high and he had an abnormal EKG. He was transferred to Charleston Area Medical Center due to enlargement of the left ventricle as a result of his history of high blood pressure. His blood pressure was 185/106, and his ejection fraction was 50 to 55 percent. The record indicates no aortic aneurysm. A CT angiogram showed no aneurysm. The claimant saw Dr. Nutter six months after his hospitalization, and he reported that he continued to smoke two packs of cigarettes daily. His blood pressure was well-controlled. He had a slight limp and he could not toe walk. He had mild left-sided weakness with excellent grip strength in the right hand. His grip strength in his left had was one-half of that on his right. Dr. Marshall reported there is no evidence of an aortic aneurysm. Although the claimant takes Hydrocodone for pain in his leg and shoulder, Dr. Marshall testified he has no idea why the claimant is prescribed this medication. Dr. Marshall opined the claimant could lift 10 pounds with his right arm and that his left arm is still usable. Dr. Marshall affirmed the opinions of Dr. Nutter's Residual Functional Capacity assessment. The opinions of Dr. Marshall are entitled to significant weight as they are supported by the entire evidence of record.

On August 14, 2008, Frank Roman, Ed.D., a State agency medical expert, reviewed the evidence of record and opined the claimant has no severe mental impairment. He felt the claimant had mild restriction of activities of daily living and mild difficulties in maintaining social functioning. Dr. Roman further opined the claimant had mild difficulties in maintaining social functioning. Dr. Roman further opined the claimant had mild difficulties in maintaining concentration, persistence or pace and had no episodes of decompensation of extended duration (Exhibit 8F). On December 2, 2008, Joseph A. Shaver, Ph.D., a State agency medical expert, reviewed the evidence of record and affirmed the opinions of Dr. Roman (Exhibit 11F). The opinions of Drs. Roman and Shaver are entitled to little weight as additional evidence has been received into the record since their review, which supports finding the claimant to have a severe mental impairment.

On August 11, 2009, Janice Blake, M.A., the examining source, opined the claimant has seriously limited but not precluded ability to work in coordination with or proximity to others without being unduly distracted, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, carry out detailed instructions and maintain socially appropriate behavior. Ms. Blake further opined the claimant is unable to meet competitive standards (cannot satisfactorily perform the activity independently, appropriately, effectively and on a sustained basis in a regular work setting) in his ability to maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without

30

special supervision, complete a normal workday and workweek without interruptions from psychologically bases symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, deal with normal work stress and deal with stress of semiskilled and skilled work (Exhibit 17F). The opinions of Ms. Blake are entitled to little weight as they are not supported by the entire evidence of record. Her opinions are based greatly on the claimant's subjective allegations, and the claimant is not entirely credible. Furthermore, these opinions are inconsistent with the claimant's own report of daily activities.

C. David Blair, Ph.D., a medical expert, reviewed the evidence of record and testified the claimant suffered a stroke in January 2008, which affected his left arm and leg. He walks with a limp and has no grip strength in his left arm. He no longer uses a cane. He is unable to control his bladder. He underwent a psychological evaluation with Janice Blake. He had rehabilitation after his stroke, and he was in a nursing home for a while. He suffers depression secondary to loss of income. He has undergone no psychological treatment. He was evaluated by Paul Dunn in August 2008. He has a mild aortic aneurysm and was laid off his job. He had numerous transischemic attacks prior to his stroke. He does not drink alcohol. There is no evidence of speech slurring, and the claimant's concentration level is okay. His pace is slow. He has weakness in his left arm and leg. Dr. Blair opined the claimant is suffering from adjustment disorder. A recent report from Janice Blake indicates the claimant has pain in his shoulder, hip and knee and that he continues to have problems with his left arm. The opinions of Dr. Blair are entitled to significant weight as they are supported by the entire evidence of record.

In sum, the above residual functional capacity assessment is supported by the objective evidence of record, the claimant's own report of daily activities and the opinions of Drs. Nutter, Franyutti, Marshall and Blair.

(Tr. at 25-27.)

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2010). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors. Additionally, the regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we

give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner.  Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources).  Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given.  Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion.  Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability.  See 20 C.F.R. § 404.1527(d)(2) (2005).  Thus, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(d)(2) (2005).

Under § 404.1527(d)(2)(ii), the more knowledge a treating source has about a

claimant's impairment, the more weight will be given to the source's opinion.  Section 404.1527(d)(3), (4), and (5) adds the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty).

Under § 404.1527(d)(1), more weight generally is given to an examiner than to a non-examiner.  Section 404.1527(d)(2) provides that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources).  The Fourth Circuit Court of Appeals has held that "a non-examining physician's opinion cannot by itself, serve as substantial evidence supporting a denial of disability benefits when it is contradicted by all of the other evidence in the record."  <u>Martin v. Secretary of Health, Education and Welfare</u>, 492 F.2d 905, 908 (4th Cir. 1974); <u>Hayes v. Gardener</u>, 376 F.2d 517, 520-21 (4th Cir. 1967).  Thus, the opinion "of a non-examining physician can be relied upon when it is consistent with the record."  <u>Smith v. Schweiker</u>, 795 F.2d 343, 346 (4th Cir. 1986).

The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.   20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)(2006).  Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).  As noted above, however, the court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational.  <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1994).

With respect to Claimant's argument that the ALJ gave insufficient weight to Dr. Rao and Ms. Blake's opinions, the undersigned proposes that the presiding District Judge find that the ALJ properly evaluated the claim and considered the treating and consulting physicians' opinions in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence.  In order for a treating physician's opinion to be given controlling weight it must be supported by clinical and laboratory diagnostic techniques and not be inconsistent with other substantial evidence.  Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. § 404.1527(d)(2) (2010).  The ALJ had the benefit of hearing the extended testimony of Doctors Blair and Marshall as they reviewed Claimant's medical record.  (Tr. at 36-54.)  Dr. Blair was particularly critical of Ms. Blake's report, commenting that it was based primarily on self-report.  (Tr. at 42.)

In the subject claim, Dr. Rao and Ms. Blake failed to provide factual support and specific clinical examination findings to support their opinions regarding Claimant's physical and mental functioning.  The ALJ reasonably gave these opinions little weight as their conclusions are not consistent with the record as a whole nor with their evaluations (Tr.  at 25-26).    Dr. Rao's suggested functional limitations are not supported by the objective evidence of record, including Dr. Rao's own evaluation of March 30, 2009 wherein he found that Claimant is "[f]unctionally independent in all activities of daily living" with normal range of motion for his back, both legs, and right arm and strength 4/5 in the left arm.  (Tr. at 419-20.)  Further, Dr.  Rashid and staff at WV Heart and Vascular Institute, treating sources, noted on multiple occasions in 2008 that Claimant was "doing well...in no acute distress...mood normal...no current symptoms...normal gait, able to

34

undergo exercise testing or rehabilitation." (Tr. at 358, 360, 425, 427." Also, on July 23, 2008, Dr. Nutter examined Claimant and found that while Claimant "had some evidence of left sided weakness. No other deficits were noted." (Tr. at 370.)

In regard to Claimant's psychiatric evidence, a review of the evidence shows that Claimant had no inpatient or outpatient psychiatric treatment. (Tr. at 37.) Further, Dr. Blair pointed out in his testimony that Ms. Blake's assessments were based primarily on Claimant's subjective complaints and self-reports. (Tr. at 39-44.) A physician's "conclusory opinion based upon [Claimant's] subjective reports of pain" does not qualify as objective medical evidence. <u>Craig v. Chater</u>, 76 F.3d 585, 590, n.2 (4th Cir. 1996); see also 20 C.F.R. §§ 404.1508, 404.1528; SSR 96-4. The undersigned has thoroughly reviewed the evidence from Mr. Atkinson and finds that it is more in alignment with Dr. Blair's findings of mild to moderate than Ms. Blake's findings. (Tr. at 472-85.) The undersigned notes that the ALJ's residual functional capacity assessment limited Claimant to detailed tasks and instructions. (Tr. at 21, Finding No. 5.)

20 C.F.R. § 404.1527(d)(2) requires the ALJ to "give good reasons" for not affording controlling weight to a treating physician's opinion in a disability determination. The "treating source rule" requires the ALJ to give the opinion of a treating source "controlling weight" if he/she finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). If a treating source opinion is not afforded controlling weight because it does not meet these criteria, the ALJ must then determine what, if any, weight to give the opinion by examining several regulatory factors (e.g., length of the treatment relationship). <u>Id</u>.

Here, the ALJ has provided "good reasons" for not giving controlling weight to Dr. Rao's and Ms. Blake's statements of Claimant's disability.  The ALJ found that "[t]he opinions of Dr. Rao are entitled to little weight as they are not supported by evidence of record, including the claimant's own report of daily activities... Her opinions are based greatly on the claimant's subjective allegations...[and are] inconsistent with the claimant's own report of daily activities."  (Tr. at 25-26.)

Therefore, with respect to Claimant's argument that the ALJ erred in not "explicitly apply these factors" set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2010),  the undersigned proposes that the presiding District Judge find that the ALJ adequately considered the six factors of (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency (5) specialization, and (6) various other factors .  (Pl. Br. at 15.)

Regarding Claimant's insinuation that the ALJ erred because he did not address Dr. Marshall's testimony that it was "absolute nonsense" that Claimant had an aneurysm, the undersigned finds this to be without merit.  (Pl. Br. at 15.)  Clearly the ALJ addressed this by concluding that Claimant had the severe impairment of a thoracic aortic aneurysm.  (Tr. at 15, Finding No.  3; Tr.  at 59.)

Claimant asserts that he was "given little opportunity to testify at the hearing concerning his daily activities, [and] the ALJ must have relied on either the function reports completed by Mr.  Balis and his father or boilerplate language in a decision-writing template in making this assumption."  (Pl.  Br.  at 16.)  This is a misleading argument as Claimant was examined by his counsel before the ALJ and given every opportunity to testify regarding his daily activities.  (Tr.  at 55-59.)  Further, the function reports completed by

Claimant, or a representative on his behalf, are reliable evidence of Claimant's daily activities.

Although the ALJ has a duty to fully and fairly develop the record, he is not required to act as plaintiff's counsel. Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). Claimant bears the burden of establishing a prima facie entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

It is Claimant's responsibility to prove to the Commissioner that he or she is disabled. 20 C.F.R. §§ 404.1512(a) and 416.912(a) (2010). Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he or she has an impairment. Id. §§ 404.1512(c) and 416.912(c). In Bowen v. Yuckert, the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings. It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step. The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . . If the process ends at step two, the burden of proof never shifts to the Secretary. . . . It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the

37

presiding District Judge **AFFIRM** the final decision of the Commissioner and **DISMISS** this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F. 2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>Wright v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir. 1984). Copies of such objections shall be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendations and to transmit a copy of the same to counsel of record.

<u>November 22, 2011</u>
        Date

                                                        *Mary E. Stanley*
                                                        Mary E. Stanley
                                                        United States Magistrate Judge

38